IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:14-CV-149-D

JAMEL O. FRAZIER,          )
                           )
            Plaintiff,     )
                           )
      v.                   )           **ORDER**
                           )
NORTH CAROLINA DEPARTMENT  )
OF TRANSPORTATION,         )
                           )
            Defendant.     )

On August 19, 2014, Jamel O. Frazier ("Frazier" or "plaintiff") filed suit pro se against the North Carolina Department of Transportation ("the DOT" or "defendant") alleging that the DOT engaged in race discrimination concerning his pay in violation of Title VII of the Civil Rights Act of 1964 [D.E. 1]. On January 9, 2015, Frazier (through counsel) filed an amended complaint [D.E. 11]. In his amended complaint, Frazier contends that the DOT applied a "budget shortfall" in a discriminatory manner in order to pay him less than similarly-situated Caucasian employees. See Am. Compl. [D.E. 11] ¶¶ 7–24. On October 15, 2015, the DOT moved for summary judgment [D.E. 23] and filed a memorandum in support [D.E. 24]. Thereafter, Frazier responded in opposition [D.E. 26], and the DOT replied [D.E. 28]. As explained below, the court grants the DOT's motion for summary judgment.

I.

Frazier is an African-American male. Am. Compl. ¶ 5; Ans. [D.E. 19] ¶ 5. The DOT is a North Carolina state agency responsible for building and maintaining state highways and roads. See N.C. Gen. Stat. § 136-18. The DOT's Division of Highways is organized into 14 subdivisions

covering North Carolina's 100 counties. See N.C. Dep't of Transp., Organizational Chart, https://www.ncdot.gov/download/about/structure/NCDOTOrgChart.pdf; N.C. Dep't of Transp., Divisions, https://www.ncdot.gov/doh/divisions/. Highway Division 2 ("Division 2") covers Beaufort, Carteret, Craven, Greene, Jones, Lenoir, Pamlico, and Pitt counties. Fanelli Aff. [D.E. 23-11] ¶ 2.

When filling a vacant position, the DOT calculates starting salaries according to a formula wherein months of experience above the position's minimum qualifications translate to a correspondingly higher salary. For every year of directly-related experience or education above the position's minimum qualifications, an applicant's salary may increase up to 5% above the minimum salary rate. See N.C. Office of Human Res., New Appointments, in State Human Resources Manual (2013), https://ncoshr.s3.amazonaws.com/s3fs-public/documents/files/New%20Appointments.pdf; see also N.C. Office of Human Res., New Appointments Summary of Revisions, in State Human Resources Manual (2013), https://ncoshr.s3.amazonaws.com/s3fs-public/documents/files/newappts_0.pdf (showing that the salary-calculation formula has not changed since 2007); Fanelli Dep. [D.E. 23-4] 16, 26, 68–70, 82. Additionally, some positions have a "special minimum rate" which allows the DOT to offer qualified applicants a certain salary, regardless of any experience or education beyond the position's minimum qualifications, if that salary would be greater than the salary under the standard calculation. See Fanelli Aff. ¶ 4.

The DOT does not have a policy providing for salary increases for employees in particular positions based on performance or length of service. Nonetheless, the DOT has an "In-Range Salary Adjustment Policy" that allows management "to correct a salary inequity within the same DOT work unit." Faulk Aff. [D.E. 23-12] ¶ 3; Fanelli Aff. ¶ 7; see generally [D.E. 23-11] 16–33. Under the In-Range Salary Adjustment Policy, a salary inequity exists when two employees in the same work

2

unit have "similar education, skill, related work experience, length of service with the DOT, and performance," but their salaries differ by more than ten percent. Faulk Aff. ¶ 3; Fanelli Aff. ¶ 7; see [D.E. 23-11] 16–33. The DOT also uses the In-Range Salary Adjustment Policy to reflect an increase in an employee's responsibilities that is substantial but not sufficient to justify a promotion and also to reflect changes in the job market. [D.E. 23-11] 10–17.

In the early 1990's, Frazier worked part-time as a car stereo "Installer." Frazier Dep. [D.E. 23-2] 10; [D.E. 23-11] 12. Beginning in 1997, Frazier was self-employed, performing various small jobs such as "troubleshooting" circuitry issues, installing satellites, and working on computers. Frazier Dep. 10–11; [D.E. 23-11] 12. Frazier took these jobs "whenever [he] could" and considered this work to be "like a hobby." Frazier Dep. 10–11. In June 1995, Frazier began his employment in the DOT's Division 2 as a temporary "Highway Maintenance Worker." Fanelli Aff. ¶ 2. In July 1998, Frazier began working as a "Transportation Worker (Level 1)." Id. From February 2001 through August 2007, Frazier worked as a "Transportation Worker (Level 3)." Id. In these positions, Frazier performed "highway and road maintenance of highways in Division 2." Id. These positions did not involve electronics work. See id. In 2004, Frazier received associate's degrees in "Electronics Engineering Technology" and "General Education" from Craven Community College. Am. Compl. ¶ 8; Ans. ¶ 8.

On May 30, 2007, the DOT posted an "Electronics Technician I" ("ET-I") position. [D.E. 23-3] 2. The salary range for the position was $29,348.00 to $46,126.00. Id. The minimum requirements for the job were "[g]raduation from high school supplemented by completion of a two-year technical school course in electronics; or an equivalent combination of training and experience." Id.

3

On June 12, 2007, Frazier applied for the ET-I position. [D.E. 23-11] 9. When he applied, the DOT determined that Frazier had directly-related experience performing electronics work beyond the minimum requirements of the position. See Fanelli Aff. ¶ 4; [D.E. 23-3] 3 ("personnel action" form); [D.E. 27-2] 4 ("salary study") (noting that Frazier had 10 months of "Outside Experience"). The DOT selected Frazier for the ET-I position. Lassiter Aff. [D.E. 23-7] ¶¶ 3–5. The DOT's Human Resources staff then determined Frazier's starting salary according to the standard formula, which authorized an increase of up to 5% above the minimum salary for every year of experience beyond the position's minimum requirements. See Fanelli Dep. 26. Based on the DOT's calculations, Frazier would have been eligible for a salary of $31,740.00, 3.99% above the minimum. Gaddy Aff. [D.E. 23-10] ¶ 4; Fanelli Aff. ¶ 4.[1] Instead the DOT offered Frazier $32,590.00, a higher special minimum salary implemented to attract qualified applicants. See [D.E. 23-5] 52 ("PD-105 Form"); Fanelli Dep. 14, 78–80. Human Resources recommended this higher salary for Frazier, and Neil Lassiter, who was "responsible for authorizing all employee hirings in Division[]2," approved it. Lassiter Aff. ¶¶ 1, 3. Thereafter, the DOT offered Frazier the ET-I position at the salary of $32,590.00, and Frazier accepted. Id. ¶¶ 3–5. On August 25, 2007, Frazier began work as an ET-I for Division 2. Am. Compl. ¶ 7; Ans. ¶ 7.

In August 2007, there were two other ET-I's in Division 2: Marvin Morning and John Butler. Fanelli Aff. ¶¶ 2, 8, 13. Morning is African American, and Butler is Caucasian. Id. Morning had

---

[1] The record does not reveal precisely how the DOT calculated Frazier's salary or how many months of directly-related experience it determined that Frazier had. The handwritten words "9.6 mon" are written on Frazier's Application for Employment over the part of the form discussing Frazier's past employment as an Installer, but nothing in the record demonstrates who wrote that note or when it was written. See [D.E. 23-11] 12. A DOT "salary study" lists Frazier as having "10 months" of "Outside Experience," but the record contains little indication of what "Outside Experience" means or how DOT collected such information. See [D.E. 27-2] 4 ("salary study"); Fanelli Dep. [D.E. 23-4] 86–87 (stating only that "Outside Experience" referred to information pulled from employee files).

4

worked as an ET-I for Division 2 since 2004. Id. ¶ 2. Butler began working as an ET-I in 2003. Id. ¶ 3. When Butler began, he had an "associate's degree in electronics and eleven years and nine months directly related experience." Id. In July 2012, Butler resigned from his position. Id. ¶ 9. Additionally, in November 2013, Joy Mix applied for a vacant ET-I position with Division 2. Rouse Aff. [D.E. 23-8] ¶ 4. Mix was eligible for a salary of $43,201.00, 35% above the minimum salary, due to her 112 months' experience, 88 months above the position's minimum requirements. [D.E. 27-1] 10. The DOT, however, applied the In-Range Salary Adjustment Policy to Mix's salary because the DOT determined that Mix had similar experience to, but received a salary more than 10 percent greater than, Morning. Fanelli Aff. ¶ 11. As a result, the DOT offered, and Mix accepted, the position of ET-I at an annual salary of $38,955.00. Id.

On October 24, 2013, Frazier filed Discrimination Charge No. 430-2013-02293 with the Equal Employment Opportunity Commission ("EEOC"), alleging that the DOT illegally paid African-American employees in the position of ET-I less than similarly situated Caucasian employees due to the African-American employees' race. [D.E. 8-1] 3. On May 19, 2014, the EEOC issued Frazier a right-to-sue notice concerning his charge of race discrimination. Id. 4. On August 19, 2014, pursuant to the EEOC's right-to-sue notice, Frazier filed a complaint pro se in this court against the DOT [D.E. 1]. On December 19, 2014, the DOT moved to dismiss Frazier's complaint for failure to state a claim [D.E. 8]. On January 9, 2015, Frazier, through counsel, amended his complaint [D.E. 11].[2] On January 22, 2015, the DOT moved to dismiss the amended complaint for failure to state a claim [D.E. 14]. See Fed. R. Civ. P. 12(b)(6). On April 10, 2015, the court denied the DOT's motion to dismiss [D.E. 18]. On October 15, 2015, after discovery

---

[2] On March 19, 2015, Frazier filed Discrimination Charge No. 430-2015-00294 with the EEOC. [D.E. 23-6] 4–5. Frazier never amended or sought to amend his complaint to include any of the allgations contained in that later charge.

5

closed, the DOT moved for summary judgment [D.E. 23].

II.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleadings, Anderson, 477 U.S. at 248, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation omitted) (emphasis removed). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007). In reviewing a summary judgment motion, the court may take judicial notice of public records. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

Frazier alleges race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1). Frazier offers no direct evidence of the DOT's discriminatory intent. Rather, he proceeds under the burden-shifting framework described in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, a plaintiff must first establish a prima facie case of discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981); Hill v. Lockheed Martin Logistics Mgmt., Inc.,

6

354 F.3d 277, 285 (4th Cir. 2004) (en banc). "[I]n order to establish a prima facie case of racial discrimination in compensation under . . . Title VII," a plaintiff must "show: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action with respect to compensation; and (4) that similarly-situated employees outside the protected class received more favorable treatment." White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004). If a plaintiff makes his prima facie showing, "the burden shifts to the employer . . . to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Lettieri v. Equant, Inc., 478 F.3d 640, 646 (4th Cir. 2007) (quotation omitted); see St. Mary's Honor Ctr., 509 U.S. at 506–07; Burdine, 450 U.S. at 253–54. If a defendant-employer meets its burden of production, then the plaintiff must prove by a preponderance of the evidence that a genuine issue of material fact exists concerning whether the employer's stated reason for the adverse employment action was a mere pretext for illegal discrimination. See, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Lettieri, 478 F.3d at 646–47; Hill, 354 F.3d at 285. "At this last step the burden to demonstrate pretext merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." Lettieri, 478 F.3d at 646–47 (quotation omitted) (alteration in original).

The standard for whether employees are similarly situated requires that their circumstances be nearly identical. See, e.g., Lightner v. City of Wilmington, 545 F.3d 260, 265 (4th Cir. 2008); Cronquist v. City of Minneapolis, 237 F.3d 920, 928 (8th Cir. 2001). Under this standard, Frazier must prove that he was similarly situated to the Caucasian ET-I's that the DOT allegedly paid more. See, e.g., Lightner, 545 F.3d at 265 ("The similarity between comparators . . . must be clearly established in order to be meaningful."); Dandy v. United Parcel Serv., Inc., 388 F.3d 263, 274 (7th Cir. 2004); Cronquist, 237 F.3d at 928. Relevant factors to consider in compensation-discrimination

7

claims under Title VII include whether the plaintiff and the proposed comparators shared similar "attributes, experience, education, and qualifications." Dandy, 388 F.3d at 274 (quotation omitted).

A.

The parties agree that Frazier is an African-American male, that Frazier's job performance was satisfactory, and that Frazier earned less than other ET-I's who are Caucasian. Am. Compl. ¶ 5; Ans. ¶ 5; Mem. Supp. Mot. Summ. J. [D.E. 24] 18. The parties dispute whether the DOT paid similarly-situated employees more than Frazier.

In his amended complaint, Frazier alleges that his salary was set outside certain "guidelines" due to a "budget shortfall." Am. Compl. ¶ 13. He alleges that two Caucasian employees received salaries "within the salary guidelines," unaffected by the budget shortfall. Id. ¶ 14. According to Frazier, this differential treatment is due to his race.

The evidence demonstrates that no "budget shortfall" affected Frazier's salary. The evidence concerning a "budget shortfall" refers to a memo dated February 14, 2002, from the North Carolina Office of State Budget and Management, which required agency heads to approve any new hires filling vacant positions. [D.E. 23-5] 50–51; see Fanelli Aff. ¶ 4; Fanelli Dep. 72. The head of the DOT approved Frazier's application to fill the vacant ET-I position. Lassiter Aff. ¶ 4. No record evidence suggests that the DOT applied the budget-shortfall policy in a discriminatory manner. Indeed, Frazier does not even mention the budget-shortfall policy in his summary judgment briefing. See [D.E. 26]. Furthermore, the record demonstrates that the DOT set Frazier's salary above the otherwise applicable salary guideline range. Specifically, Frazier's starting salary was $32,590.00. Gaddy Aff. ¶ 4; Fanelli Aff. ¶ 4. Using the DOT's standard formula, Frazier would have been eligible for a salary of $31,740.00, 3.99% above the minimum, based on his education and experience. Gaddy Aff. ¶ 4; Fanelli Aff. ¶ 4. Instead, the DOT offered Frazier $32,590.00, a

"special minimum rate" put in place to attract qualified applicants. See [D.E. 23-5] 52 ("PD-105 Form"); Fanelli Dep. 14, 78–80. Moreover, the only evidence of any salary that the DOT reduced below the formula's calculations is the salary of a Caucasian employee, Joy Mix, whose salary was reduced to avoid salary inequities between Mix and another Division 2 ET-I. Rouse Aff. [D.E. 23-8] ¶ 4; Bell Aff. [D.E. 23-9] ¶ 7; Gaddy Aff. ¶ 5; Fanelli Aff. ¶ 11. Thus, Frazier's race-discrimination claim concerning the "budget shortfall" fails.

To the extent that Frazier's amended complaint addresses the salaries of two Caucasian employees, Butler and Mix, those employees were not similarly situated to Frazier because Butler and Mix had significantly more experience than Frazier when hired. Cf. Am. Compl. ¶¶ 14–18. The record shows that the DOT sets an employee's salary at hiring and that salaries may increase pursuant to department-wide legislative raises or adjustments pursuant to the In-Range Salary Adjustment Policy. No evidence suggests, however, that the DOT awards individual raises based on performance or length of service. See Fanelli Aff. ¶¶ 8, 13. When the DOT hired Frazier as an ET-I for Division 2, he had an associate's degree in "Electronics Engineering Technology," which satisfied the minimum requirements of an ET-I, and an additional 10 months' experience working with electronics. See [D.E. 23-5] 52; [D.E. 25] 1 ("salary study"). By contrast, when the DOT hired Mix as an ET-I for Division 2, the DOT credited her with 112 months' experience in electronics work, 88 months above the minimum requirements. [D.E. 23-5] 38 ("personnel form"). When the DOT hired Butler as an ET-I, he had 141 months' experience, 117 months above the minimum requirements. See Fanelli Aff. ¶ 13. The length of these employees' experience when hired–nearly a decade for both Butler and Mix–as compared to Frazier's means that Frazier was not similarly situated to these employees. See, e.g., Lightner, 545 F.3d at 265; Dandy, 388 F.3d at 274; Cronquist, 237 F.3d at 928.

9

In response to the DOT's motion for summary judgment, Frazier identifies two other Caucasian employees he claims are similarly situated and currently receive higher salaries: Douglas Carlyle and Derrick Martin. See Pl.'s Mem. Opp'n Mot. Summ. J. [D.E. 26] 6–7. However, based on the record evidence, both Carlyle and Martin have more experience working with electronics than Frazier. As of February 2014, when the DOT conducted a "salary study," Frazier had 88 months' experience: 78 with the DOT and 10 elsewhere. [D.E. 27-2] 4 ("salary study"). In contrast, in February 2014, Carlyle had 103 months' experience, and Martin had 109 months' experience. Id. With over a full year of experience more than Frazier, these two employees are not similarly situated to Frazier. See, e.g., Lightner, 545 F.3d at 265; Dandy, 388 F.3d at 274; Cronquist, 237 F.3d at 928. Because Frazier has failed to meet his burden of showing a prima facie case of discrimination, the court grants the DOT's motion for summary judgment.

B.

Alternatively, even if any of the employees referenced in Frazier's amended complaint or briefing were similarly situated to Frazier, the DOT has offered a non-discriminatory reason for the salary differential: differing levels of electronics experience. The evidence shows that the DOT determines starting salaries using a formula wherein new hires who have only the bare minimum of education or experience required for a position are eligible for a certain minimum salary. See [D.E. 23-5] 2–10 ("State of North Carolina Salary Plan"); Fanelli Dep. 16, 26, 69–70, 82. New hires with more related experience or education receive a higher salary, at a rate of five percent per year of additional experience or education, up to a certain maximum salary. See [D.E. 23-5] 2–10 ("State of North Carolina Salary Plan"); Fanelli Dep. 16, 26, 69–70, 82. Under this system, the DOT legitimately pays some employees more than others. Additionally, the DOT may increase salaries after an employee is hired based on "legislative" raises, which apply to all employees, or based on

10

an in-range salary adjustment. Faulk Aff. ¶ 3; Fanelli Aff. ¶¶ 4, 7, 13; [D.E. 23-5] 9; see generally [D.E. 23-11]16–33 ("In-Range Salary Adjustment Policy & Procedures"). However, no record evidence suggests that the DOT gives raises based on performance or term of service. Thus, the DOT has met its burden of showing a legitimate, nondiscriminatory reason for Frazier's lower salary when compared to other employees.

Under McDonnell-Douglas's third step, Frazier must demonstrate that a genuine issue of material fact exists as to whether the DOT's system of setting salaries based on initial determinations of education and experience is a pretext for race discrimination. Because Frazier has failed to produce any evidence showing that the DOT's use of this system is pretextual, his race-discrimination claim cannot survive the DOT's motion for summary judgment.

In opposition to this conclusion, Frazier makes four arguments. First, Frazier argues that DOT deviated from its "established or required policies" by failing to use the DOT's In-Range Salary Adjustment Policy to raise his salary. Pl.'s Mem. Opp'n Mot. Summ. J. 14. The In-Range Salary Adjustment Policy, however, did not support raising Frazier's salary. The DOT uses in-range salary adjustments to remedy "salary inequities," which the policy defines to occur when workers within the same unit have salary differentials of ten percent or more but nearly identical experience. [D.E. 23-11]16–33 ("In-Range Salary Adjustment Policy & Procedures"); Faulk Aff. ¶ 3; Fanelli Aff. ¶ 7. Frazier has not produced evidence of a similarly-situated employee whose salary was at least ten percent greater than his. Moreover, in 2013, Frazier requested an in-range salary adjustment, but the DOT found that there was no salary inequity between Frazier and any of his coworkers because none of his comparable coworkers had salaries more than ten percent higher than Frazier's salary. Fanelli Aff. ¶¶ 8–10. Furthermore, the only evidence concerning the In-Range Salary Adjustment Policy shows that the policy was used to reduce a Caucasian employee's salary. Id. ¶ 11. The policy, by

11

its terms, did not support raising Frazier's salary. Thus, the DOT's failure to apply the policy to raise Frazier's salary does not show that the DOT's proffered explanation was pretextual.

Second, Frazier argues that the DOT's method of determining salaries is itself a pretext for race discrimination because it allows the DOT to make subjective evaluations. Specifically, Frazier argues that the differences between the amount of experience credited to himself and to Mix were pretextual because "a reasonable jury could infer" that Mix's prior experience "was not relevant to the job qualifications." Pl.'s Mem. Opp'n Mot. Summ. J. 15. Frazier, however, has produced no evidence of the specific nature of Mix's prior work experience and only the most basic descriptions of his own. See Frazier Dep. 10–11; [D.E. 23-11] 12 ("application for employment"). Even if a jury could find that Frazier's specific experiences were more relevant than Mix's experiences, such evidence would show only that the DOT's use of the length of an employee's experience was an imperfect tool for assessing job qualifications. It would not demonstrate that the DOT's system, which the DOT implemented before Frazier or Mix applied for the ET-I position, was a pretext for race discrimination. Moreover, Title VII does not empower this court to sit as a human-resources department and to revise an employer's arguably imperfect but non-discriminatory personnel practices. See, e.g., DeJarnette v. Corning, 133 F.3d 293, 299 (4th Cir. 1998); Rocha v. Coastal Carolina Neuropsychiatric Crisis Servs., P.A., 979 F. Supp. 2d 670, 680–81 (E.D.N.C. 2013).

Third, Frazier argues that the DOT has a "general policy and practice" of disfavoring African-American employees. In support, Frazier cites Ahmed v. Johnson, 752 F.3d 490, 503 (1st Cir. 2014), in which the First Circuit held that an employer's "general policy and practice" of discrimination was probative of pretext under McDonnell Douglas. The Fourth Circuit has never directly adopted Ahmed, but even if Ahmed's "general policy and practice" rule applies in this circuit, no evidence suggests that DOT engaged in a general policy or practice of race discrimination concerning salaries.

12

Notably, in Ahmed, the employer had "a history of hiring and promotions that entirely excluded African-Americans." Id. In contrast to Ahmed, Frazier's only evidence of a "general policy" is a single act in which the DOT assessed Frazier's complaints of salary inequities by comparing Frazier's salary to an African-American employee and not to Mix, a Caucasian employee with more experience. See Fanelli Aff. ¶¶ 8–10; Pl.'s Mem. Opp'n Mot. Summ. J. 15–16. This single act does not demonstrate a general policy or practice of race discrimination concerning salaries and does not evince that the DOT's proffered justifications for Frazier's salary were pretextual.

Finally, Frazier cites Dennis v. Columbia Colleton Medial Center, Inc., 290 F.3d 639, 648 (4th Cir. 2002), and argues that because certain Caucasian employees were paid more than Frazier, he has met his burden under the third step of McDonnell Douglas. See Pl.'s Mem. Opp'n Mot. Summ. J. 16–17. Dennis, however, cannot bear the weight that Frazier places on it. In Dennis, the Fourth Circuit discussed Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000), and noted that the "'factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.'" Dennis, 290 F.3d at 648 (emphasis added) (quoting Reeves, 530 U.S. at 147). In Reeves, the Supreme Court also listed two examples of circumstances where a jury would be unable to find pretext: "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the planitiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted evidence that no discrimination had occurred." Reeves, 530 U.S. at 148. Those examples were "not meant to be exhaustive." Dennis, 290 F.3d at 649.

In Dennis, the employer offered "inconsistent post-hoc explanations for its employment decisions," and the Fourth Circuit held that those explanations, while possible, were not so definite

13

as to require judgment as a matter of law. Id. at 646–49. The Fourth Circuit based its holding in Dennis in part on "'the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.'" Id. at 648 (quoting Reeves 530 U.S. at 147). In contrast to Dennis, Frazier has produced no evidence of pretext. Moreover, unlike in Dennis, the DOT has not offered inconsistent explanations for its salary determinations or that its proffered justifications were pretextual. Assuming without deciding that Frazier's lower salary is "consistent with discrimination[, that fact] does not alone support a reasonable inference that the decisionmakers were motivated by bias." McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 586 (4th Cir. 2015) (emphases omitted). Because Frazier has produced no evidence of pretext, the DOT is entitled to summary judgment as to Frazier's race-discrimination claim.

C.

In his summary judgment briefing, Frazier raises a new set of arguments, contending that the DOT's initial determinations of job applicants' relevant experience are subjective and applied in a discriminatory fashion. Pl.'s Mem. Opp'n Mot. Summ. J. 9–19. These theories are entirely different than the theory advanced in Frazier's amended complaint, which argued that the DOT applied a budget-shortfall policy in a racially discriminatory manner. Compare id., with Am. Compl. ¶¶ 7–24. To the extent that Frazier's new arguments present allegations of different forms of race discrimination, rather than an attempt to show that the DOT's justifications for the salary differences were pretextual, Frazier cannot use summary-judgment briefing to amend his complaint. See, e.g., Hexion Specialty Chems., Inc. v. Oak-Bark Corp., No. 7:09-CV-105-D, 2011 WL 4527382, at *7–10 (E.D.N.C. Sept. 28, 2011) (unpublished) (collecting cases holding that a party cannot use briefing in support of or opposition to summary judgment to amend its complaint). The same is true to the

14

extent Frazier argues that the DOT's failure to implement in-range salary adjustments itself racially evinced discriminatory treatment. See id.

III.

In sum, the court GRANTS defendant's motion for summary judgment [D.E. 23]. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 26 day of September 2016.

JAMES C. DEVER III
Chief United States District Judge